UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------------------------X
UNITED STATES            :
                                    :
v.                            :         CASE NO: 1:15-CR-10145-RGS
                                    :
DEMETRIUS WILLIAMS,     :
       Defendant          :
-----------------------------------------------X

*SENTENCING MEMORANDUM IN SUPPORT OF DEMETRIUS WILLIAMS*

## I.   INTRODUCTION

The Government's narrative in this case since Day 1 has been riveting.

The tale of Columbia Point.  Setting the stage in the government's submission

concerning pretrial detention, Special Agent Matthew C. Knight's depiction:

<u>"Promise of a Bright Future"</u>

- Land used as a pasture for animals;
- Home to a United States Army barracks called Camp McKay – the one-story wood barracks built in 1942 used to house Italian prisoners of war during World War II;
- Prisoners moved out at war's end; the Boston Housing Authority deciding to develop this "neglected section of Dorchester," "devis[ing] an ambitious plan for this barren stretch of land;"
- Breaking ground in 1951 – Boston Mayor John B. Hynes announcing that a major shopping center, chapel, school, playgrounds and beach would be constructed in or near the project to make it "the most self-sufficient section of the city" – the largest housing project ever built in New England opened with great ceremony within three years;
- Success early on – Columbia Point filled with working-class families excited about living in a new community "promised to be a safe and sanitary place" to raise their families, and  engendering "real community spirit.  Families were real close to each other . . . you never even locked your doors."[1]

---

[1]     *See* Affidavit of Special Agent Matthew C. Knight in support of Government's

Fleshing out the narrative, Knight detailed plot developments:  ravaged by gang violence and crime and "on the road to deterioration" by the mid-1960's;[2] subjected to academic study by the Institute for International Urban Development in Cambridge, Massachusetts,

> by the 1970's, news stories about Columbia Point almost exclusively dealt with crime and gang violence.  By that time, Columbia Point had become so severely plagued by crime that the Boston Fire commissioner asked for police protection for all fire engines responding to Columbia Point;[3]

written about for a national audience by the New York Times,

> [B]y the early 1980's 80% of the units in Columbia Point were vacant, and the project was largely under the control of gangs and other criminal elements.  Many residents fled Columbia Point to protect their children.  Columbia Point was largely regarded as one of the most dangerous and unsanitary public housing projects in the city, with only 350 units legally occupied during this time and many of the vacant units occupied by squatters, drug dealers, and prostitutes.  As one tenant reported, 'no one wanted to come out here . . . the gangs were infesting our housing.'[4]

Depositing the "Columbia Point Dawgs" into this milieu, Knight forecasts how the failures of Columbia Point will be laid at Demetrius's feet:

The 1980s:  Born By Blood

In the early 1980s, members of a street gang from Detroit, Michigan, moved in and set up a drug trafficking organization

---

Submission of Detention Affidavit, (Document 8), (hereinafter "Knight"), at ¶¶ 4-7.

[2]      Knight, ¶ 8.

[3]      Knight, ¶ 8.

[4]      Knight, ¶ 8-9.

> inside the Columbia Point housing complex.  They were called the "Bomb Boys," also referred to as the "Detroit Boys."  Once the Bomb Boys established themselves in the projects, they employed many of the residents to assist them in their drug distribution network which expanded into the Roxbury/South End neighborhood in Boston.[5]

A glaring problem with this scene?  Demetrius was not yet born.

> Knight continues nevertheless:

> Columbia Point residents working with the Bomb Boys eventually rebelled against the outsider-leadership from Detroit.  In 1988, the leader of the Bomb Boys, Toby Johnson, a/k/a "Blood," was stabbed to death after leaving a nightclub in Roxbury.  George and John Chatman, two brothers from Columbia Point who had worked for the Bomb Boys's drug trafficking business, subsequently pled guilty to the Johnson murder and were sentenced to 12-15 years' imprisonment.  The Johnson murder marked the end of the Bomb Boys reign in Columbia Point.  By 1989, the Boston Police began receiving information that Columbia Point was being run by the "Columbia Point Dawgs," a gang made up almost entirely of Columbia Point residents.[6]

In 1989, Demetrius was 3 years old.

> Notwithstanding that fact, Knight goes on:

> While the Columbia Point Dawgs were taking over the Bomb Boys' drug business, Columbia Point was falling further and further into disrepair.  The City of Boston turned over management of the development to a private management company which began a lengthy renovation project that would ultimately become the Harbor Point development.  To facilitate the renovation, the management of the development instituted a series of evictions and trespassing notices against members of the Columbia Point Dawgs, essentially banning them from the development.  In response, members of the CPD began relocating their drug trafficking activity to other neighborhoods in Boston, in particular the Lenox Street

---

[5]     Knight, ¶ 10.

[6]     Knight, ¶ 11.

projects and the area of Morton Street and Clarkwood Street in Mattapan.[7]

And on.  And on.   Twenty-two paragraphs discussing over seventy years of history Demetrius is not responsible for.  In fact, the government's case against Demetrius does not begin until March 15, 2013, when an undercover cooperating witness makes a controlled purchase from him of 26.6 grams of crack.

No one, least of all Demetrius Williams, is making excuses for the criminal misconduct he knowingly and actively engaged in.  Demetrius accepts responsibility for his actions, recognizes the need for punishment, and has done the best he can to articulate recognition of these facts to the Court:

> *I know that what I did was wrong.  I know that I have to pay my debt to society.*[8]

Demetrius also knows better than anyone the mistakes he has made, the loved ones he has let down, the community he has harmed.  And, he is genuinely sorry:

> *First and for most I would like to apologize to my mother who did her best to raise me and my four brothers as a singel parent.  Second I would like to apologize to my family and daughter who due to my actions, she will grow older in a singel parent house hold as I did and that was never my intention.  Last but no least I would like to apologize to the court and my community, growing up in a singel parent household was hard for me with a father doing 20 years in prison and a struggling mother taken odd jobs to provide stability for me and 3 others.*[9]

---

[7]  Knight, ¶ 12.

[8]  *See* Allocution Statement of Demetrius Williams, ¶ 7, Exhibit 1.

[9]  *See* Letter to The Honorable Judge Stearns from Demetrius Williams, Exhibit 2.

The fact is though, Demetrius's misconduct can only be considered, and understood, in the context of, and as a product of, the complex trauma inherent in growing up in an environment that even the Government, in breathtaking detail, paints as a war zone.  Similarly documented as such by the University of Massachusetts – Boston in compelling video, the narrator somberly intones over aerial footage of burned out, abandoned buildings that used to house 1,500 families, interspersed with interior camera shots of dark, trash-strewn stairwells where only 300 families were surviving by the time Demetrius was born:

> *Thirty years after its construction, the Columbia Point Housing Project in Boston, Massachusetts had become a symbol of the failure of public housing in America – a nightmarish zone of poverty, crime and despair.* [10]

A male resident who remained recalling:

> *Nobody cared anything about Columbia Point.  Nobody did anything about Columbia Point.  You know.  It was just a matter of, you exist on your own if you gonna exist at all.* [11]

Another woman resident describing how safety and security went missing in action:

> *[We were] scared to death to have a fire in the house, or for anyone to get sick.  The fire department, the ambulances would stop down at the Bank of Boston and wait for a police escort to come in.  People here were prisoners in their own homes; prisoners in their own neighborhoods.*[12]

It's no wonder, the skills Demetrius was actively encouraged to, and

---

[10]     *See* "Point of Change" from UMass Boston Archives on Vimeo, https://vimeo.com/189049457., ("Point of Change"), 00:13 - 00:26, Exhibit 3.

[11]     *See* "Point of Change" 00:27 - 00:38.

[12]     *See* "Point of Change" 00:42 - 00:51.

rewarded for developing, from the time he was young child, were geared entirely towards surviving; and safe to say, are *nothing* like the ones officers of this Court were presumably taught growing up.  His primary teacher of survival skills, stepfather Herbie Small, Sr., was the only father Demetrius has ever known.  Entering Demetrius's life at age four, Mr. Small gave Demetrius the same caretaking, guidance, love and emotional support given his biological children; and, Mr. Small taught all of his boys the same lessons, because that was the only way *he* knew "of surviving," "having food on the table," "not having to depend on somebody to take care of you."

Sample lessons?  Mr. Small recounted to counsel via telephone, from his prison cell in Macon, Georgia where he is serving a natural life sentence for armed robbery, what he taught his boys about how to successfully shoplift:

> *When you stealing.  Don't just walk around the store.  Go directly to what you're going to get.  Don't be looking around.  Take and get out.*[13]

Another lesson, on dealing drugs:

> *Who you selling weed for?  Nobody.  You cannot be compromised.  Learn to be your own man.  Make your own decisions.  You are not going to buy weed and turn around and sell it for someone else.  You are in charge.*[14]

Unfortunately, this is not a made-for-TV movie.  Rather, at this juncture, the Court is faced with the enormously complicated task of fulfilling *all* of the

---

[13]     *See* Affidavit of Counsel, Exhibit 4.

[14]     *See* Exhibit 4.

purposes of sentencing.[15]  Beginning with what the United States Supreme Court

has described as "uniform and constant in the federal judicial tradition for the

sentencing judge to consider," i.e., every convicted person is an individual and

every case is a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue.  *See Pepper v. United*

*States*, 562 U.S. 476, 487-88 (2011).  Accordingly, the following memorandum is

submitted to provide the Court with information regarding Demetrius in order

to aid in crafting an appropriate sentence that fulfills the goals of retribution,

deterrence, incapacitation, and rehabilitation in the most effective and efficient

manner.

II.    *APPLICATION OF 18 U.S.C. § 3553*

Consistent with the federal courts' long-standing, deep concern for

individualized sentencing, the United States Supreme Court has repeatedly

affirmed individualized assessments accomplished by considering applicable 18

U.S.C. § 3553(a) factors in fashioning an appropriate sentence.  *See e.g. United*

---

[15]    One federal judge has framed the purposes of sentencing as follows:  "We have long understood that sentencing serves the purposes of retribution, deterrence, incapacitation, and rehabilitation.  Deterrence, incapacitation, and rehabilitation are prospective and societal – each looks forward and asks:  What amount and kind of punishment will help make society safe?  In contrast, retribution imposes punishment based upon moral culpability and asks:  What penalty is needed to restore the offender to moral standing within the community?"  *United States v. Cole*, 622 F. Supp. 2d 632, 637 (N.D. Ohio 2008) .

Federal sentencing law tracks these purposes.  Section 3553 tells Court to choose a sentence that reflects the seriousness of the offense (retribution), promotes respect for the law (retribution, general deterrence), provides just punishment for the offense (retribution), affords adequate deterrence to criminal conduct (general deterrence), protects the public from further crimes of the defendant (specific deterrence, incapacitation), and provides the defendant with needed training, care, and treatment (rehabilitation).  18 U.S.C. § 3553(a)(2).

*States v. Booker*, 543 U.S. 220, 259-260 (2005); *Rita v. United States,* 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Pepper, supra*.[16]  Moreover, the U.S. Supreme Court has highlighted Congress's directive that: "[n]o limitation . . . be placed on the information concerning the background, character, and conduct of a defendant that a district court may receive and consider for the purpose of imposing an appropriate sentence." *Pepper, supra*, at 490-91, *citing* 18 U.S.C. § 3661.

With respect to application of the Guidelines, the district court <u>cannot</u> presume that the Guidelines range applies to any particular case.  *Rita v. United States*, 551 U.S. 338 (2007).   Rather, the Guidelines are simply a starting point from which the district court then has the discretion to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.  *Pepper, supra* at 489-90.

Sentencing under Section 3553(a) therefore requires the Court to start with the minimum sentence permissible and add only so much additional punishment, if any, as is necessary to comply with Section 3553(a)'s purposes. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (Section 3553(a) "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing . . . .")

---

[16]     The sentencing court is not required to consider individually each of the Section 3553(a) factors before issuing a sentence.  Rather, a district court need only consider the factors *en masse* and state its reasons for imposing a given sentence.

In this case, the minimum sentence permissible is the ten-year mandatory

minimum that must be imposed for conviction on Count 1.  *See* 21 U.S.C. § 846

and 21 U.S.C. § 841(b)(1)(A).  On the other hand, the Plea Agreement provides

that the recommended range is 151-188 months;[17] the Government will

recommend a sentence of 151 months if the instant sentence does not run

concurrent to the sentence imposed in Docket No. 15-cr-10050-MLW, or

recommend 188 months of incarceration if the sentences in these cases are to run

concurrent.

   After considering all of the goals of sentencing, as well as Demetrius's

background, character and conduct, counsel submits that a downward variance

from the Plea Agreement range of 151 to 188 months, to a 120-month sentence of

---

[17]   The guidelines sentencing range calculated by Probation, (235 months to 293 months) is not accurate.  *See* Presentence Report, ("PSR"), ¶ 195.  As referenced in the body of this memorandum, Probation's calculation is arrived at by improperly inflating Demetrius's role in the conspiracy – incorrectly adding +4 (per U.S.S.G. § 3B1.1(a), rather than the appropriate +2, (per U.S.S.G. § 3B1.1(c)).

   Further, while Probation's calculation of Demetrius's criminal history score (IV) based on seven criminal history points may be technically accurate, this calculation grossly overstates his criminality because: (1) one of those points stems from Demetrius's other case in U.S. District Court, Docket No. 1:15-cr-10050-MLW, and concerns conduct which arguably is part and parcel of the instant case; (2) one point stems from a plea of guilty in August, 2014 in a state district court in Seabrook, New Hampshire, for Possession of Marijuana which was disposed of by payment of a $400 fine, conduct which is legal under Massachusetts state law; (3) one point stems from a guilty plea in Suffolk Superior Court stemming from a July 16, 2013 charge for Carrying a Dangerous Weapon (Brass Knuckles), conduct which is again arguably part and parcel of the instant case; (4) two points stem from a guilty plea on July 6, 2009, that Demetrius entered after spending 74 days in jail pretrial, because the Commonwealth agreed to dispose of the case with a one-year term of probation if he plead guilty and he could get released that same day.  Further, the case stemmed from Demetrius's use of a credit card/gift cards at the Natick Mall that had been given to him by his paternal uncle, and which he did not realize contained fraudulent numbers/information.  These facts were presumably contemplated by the Government in agreeing to recommend a sentence between 151-188 months (which would correspond with the correct and agreed upon Base Offense Level of 33 and Criminal History Category II – i.e., 2 or 3 criminal history points rather than 7).

imprisonment in a Bureau of Prisons facility, would be sufficient but not greater than necessary to accomplish the goals of sentencing.

## III.   RELEVANT SENTENCING FACTORS

### A.   HISTORY & CHARACTERISTICS OF DEMETRIUS WILLIAMS

The Court knows something about the family Demetrius was born into: multiple cousins, two brothers, and his father are named in the same indictment. The Court also knows something now about the environment Demetrius grew up in.  What the Court may still not understand is what it looks like, what it feels like, what life is like, when you're the second of three children born within the space of about three years, to a teenage mother and a father who beat your mom, and was then out of the house and out of your life by the time you were about three years old.

It looks like this:

Your mom obtaining a section 8 voucher for housing outside of Columbia Point after your baby brother was born, and trying to move out to the assigned apartment in Chelsea; then being too scared to live there full-time with three little boys and therefore returning with her boys to Columbia Point at night to sleep in the family apartment she grew up in because it felt safer there then out alone without protection.

Your moves constant – every year when the lease is up.  Different apartment, different neighborhood, different school to assimilate into.  Chelsea. Fields Corner.  Blue Hill Ave.  Jamaica Plain.  Talbot Ave.  Codman Square.

10

Rockwell Street.  Brockton.  Foxboro.  Norwood.   Relying on and staying close to your brothers always, as they are the only constants in your life.

Your family growing – two more little brothers added to the mix before childhood is up after your mom began a relationship with the man who will become your step-father.  A step-father who, despite being in and out of the household due to frequent incarcerations, becomes your primary protection from the dangers of the street as a young boy, and primary teacher how to survive in those same streets as you grow into a young man.

Your struggles in school also growing as learning disabilities that appear to have been diagnosed around the age of 8 or 9, and resulted in special education services being ordered, are exacerbated by the lack of stability and continuity.

Your mom moving you and your four brothers suddenly down to Georgia, right in the middle of your 11th grade year (January, 2002), desperate to escape the dangers and dangerousness always at your doorstep.  Your mom lasting all of two years before returning with you and your brothers to Columbia Point in January, 2004, because living in Georgia with no extended family assistance proved to be too difficult for her.

Your life changing forever when your older brother, Jamal, whom you adore, idolize really, unexpectedly dies the next year (2005) from an illness; the circumstances of which makes the listener wonder whether it was due to the illness itself, or lack of access to appropriate and timely health care.  The pain of

11

this loss is intense.  Visits to Jamal's grave daily – hastening your descent into

drugs and alcohol in attempts to self-medicate; shaping your resolve to provide

for and protect your younger siblings and extended family members regardless

of what's involved; hardening yourself to deal with those outside forces that

pose any danger to your loved ones.

What does this sort of life feel like?  Hard to convey.  Demetrius was

unable to articulate to counsel what it feels like to grow up in a war zone, be

exposed to domestic violence, lose your father and stepfather to long-term

incarceration, lack any stability or continuity in housing and schooling, generally

have to fend for yourself while your mother worked to support you and your

four brothers as a single parent, and suffer traumatic loss of a loved one at an

early age.  While the effects of these traumatic and life-changing events were

readily apparent, and described unsolicited, by those who knew him well,[18]

Demetrius was only able to come up with one word to describe his childhood

during the presentence interview – "difficult."  *See* Presentence Report, ("PSR"),

---

[18]    *See e.g.* Letter of Minister Angela M. Hart:  "this kid has suffered major loss in his life. One being raised without a father, the premature death of his eldest brother to health issues forcing him to become the oldest of three younger brothers."

Letter of Minister Stephanie Williams Crosby:  "Demetrius played a vital role in his younger siblings lives after the death of his eldest brother Jermall that died suddenly.  He felt the need to take on the role of a parent to those in need whether older or younger meanwhile burying his own hurt and emotions."

Letter of Mr. Hakim:  "The traumas in Demetrius's life included, but were not limited to, the loss of his eldest brother at a very early age; his father and stepfather being sentence[d] to many years and/or life in prison; watching his mother struggle as a single parent; and growing up in Columbia Point, which was considered one of the worst housing projects in Boston."

*See* Exhibit 5.

at ¶ 160.

It is also clear to counsel that Demetrius tried not to feel anything as he grew older – deploying well-known coping mechanisms including beginning to use marijuana and alcohol as a young teenager.  His periodic use however jumped dramatically after Jamal's unexpected death – increasing immediately to a bottle of Hennessey and four to six marijuana blunts per day by his recollection, and the addition of Percocet use several times per week. Demetrius's use of these coping mechanisms appears to have essentially continued unabated until his arrest.

 Given this background, what can be said of Demetrius's character and conduct historically speaking?  The letters that poured in on Demetrius's behalf from family, friends, and his community, provide valuable perspective.[19]  From his cousin, Charlotte Funches:

> *Demetrius is my first cousin, but more like my brother.  Himself, along with his siblings were (at the time) the only brothers I had before my own, so we grew up pretty close.  For as long as I can remember Demetrius has always been a good spirited person.  Readily available, hand and heart extended ready to help.  He has taught me so much as far as how to be a good friend, person of my word, and an all around decent human being. He's instilled in me a sense of responsibility not only through the wisdom of his words, but the integrity of his actions.*
>
> *There's no way to be a perfect person, but there's a million ways to be a good one. My love and respect for him goes so far beyond the friend/cousin he is to me, but the great friend he's shown himself to be to others as well. Since the passing of his older brother (in 2005), Demetrius' role became the new "go to person" (as his older brother once was). I relied on that. The voice of reason, mediator, and rationalist. Being a person to give sound advice, encouragement, and lending an ear whenever needed has*

---

[19]   All letters of support written for Demetrius are attached as Exhibit 5.

proven to me that he's a person who genuinely just cares about people.

Demetrius and I often sat, and I'd tell him about my dreams of becoming a celebrity stylist. At the time he was starting a small clothing business of his own where he'd allow me creative control with his brand by styling, and altering a few to be sold. He saw something different in me than what others may have called being too "dreamy minded," and took a chance on me by giving me a shot. I was so grateful because he saw that I was missing that space to pour my energy into and gladly provided it for me. It was the pick me up that I needed to stay busy until my time had come to move to LA where I'm proud to say that I am the celebrity stylist he encouraged me to be.

Demetrius continues to go above and beyond for everyone he knows.  This is the person my family and I look forward to seeing at our family gatherings for his hilarious jokes, good story telling, and I can't neglect to mention his great dance moves lol. No matter the occasion if there's a dance floor, he's on it. Always by my side, right to my left. As if dancing isn't good enough, add chef to the repertoire. Annually, the males put together a dinner in acknowledgment of Mother's Day. Demetrius contributes by making miracle meals without a stove. He has convinced me that fully prepared (by microwave) meals are just as satisfying as stovetop lol. Talk about learning something new every day.

 For being the personality that he is, he will continue to be blessed and highly favored. Even in his current situation (as unfortunate as it is), he still inspires with his optimism. Demetrius continues to encourage me to model his example and live in good spirits. He knows that there's no testimony without a test and this is just his. I believe that a good person depends on who's judging, so I wish it were possible for you to see through the eyes of anyone whose ever conversed with him or know and love him. The father, son, brother, cousin, nephew, friend...He's truly a God send.

In closing I want to mention that I was married recently, September 17, 2016. It was the peak and pit of my life. The peak (of course) because I was getting married, but the pit because I didn't have one of my favorite people there to share in that moment with me. Laughing, joking, dancing. Always by my side, right to my left. I miss him terribly. I pray that God has favor over him in this situation, and that you consider the person that I KNOW when sentencing him. I beg for leniency.

Prayerfully, this letter serves its purpose.

From his mother, Minister Stephanie Williams Crosby:

> *As a child Demetrius gained the pet name MEEK and lived up to that name.  He continuously demonstrated love and compassion for friends, family and strangers.  Demetrius played a vital role in his younger siblings lives after the death of his eldest brother Jermall that died suddenly.  He felt the need to take on the role of a parent to those in need whether older or younger meanwhile burying his own hurt and emotions. If I was asked to describe Demetrius I would say he is truly a meek, pure hearted individual, very compassionate, loving and trust worthy always willing to assist others.*

From a childhood friend's mother, Minister Angela M. Hart:

> *Out of all of my sons friends I recall telling him Demetrius was a true friend; I said this because he always demonstrated compassion and concern.  Demetrius would continuously call my home checking to see if my son made it in until he actually made it home.*

From an associate of his mother's, Pastor Franki L. Evans:

> *I have known Demetrius for over ten (10) years now.  Demetrius wasn't a member of my church, however, he has attended many services and has been at the church frequently dropping off or picking up some of his family members.  He has also invited some of his friends to some of the church services that were held on different occasions.*

> *Demetrius has always been very respectful to me as well as other members of the church and when Min. Stephanie (mom) would have church functions at her home he still would remain respectful.  I haven't seen him ever be disrespectful.  My first thought of Demetrius was someone who was very introverted (shy, reserved) however, I noticed that once he warms up to you he really is a warm natured diverse person.*

> *I have also known Demetrius to be a hard worker, as I reflect a few years back.  He and some of his family members started a cleaning business, manicuring lawns, snow removal and the like.  He really aimed hard at being a positive role model in his family, and even the more when he became a young father.  He is a very spiritual individual that has strong beliefs and faith.*

From a Program Supervisor for the Boston Centers for Youth and Families in the

City of Boston, Johnnie Kindell Jr.:

*In my role with the City of Boston, I primarily work with teens and pre-teens to help them avoid the pitfalls of the street.  I have known Demetrius for a large part of his life and watched him grow up from adolescence to young adult[hood].*

*In order to give a proper context on my opinion of his character, I would like to first describe the neighborhood in which we both grew up. Demetrius and I are both products of larger families that have resided in the Columbia/Harbor Point community in Boston.  What is now a picturesque neighborhood which houses many college students and sits in the middle of a fast changing landscape of new buildings and capital projects, was once a housing project occupied by families plagued with the many ills of poverty and bleak opportunities.  While we both come from loving families, we also had to grow up in a neighborhood that could often times be rough and unforgiving.*

*Demetrius has always shown the ability to be a leader and [has] the intelligence to do great things.  When he was young we often had conversations about him growing up to make money and move his mom to a big home and provide his family with all the luxuries that he saw on television.  I fondly remember Demetrius as a youth being charismatic and upbeat, however as I mentioned previously our neighborhood can at times sap the positive energy from a youth and darken his or her spirit.  In a misguided attempt to earn the respect of the neighborhood, youths can at times lose their way.  Somewhere along his path to reaching his potential Demetrius unfortunately lost his way, however our conversations about life did not stop.  As a rule of life I try hard to avoid judgement of others during my interactions, so I never discussed specifics about his lifestyle with Demetrius however he often spoke to me about changing his life and doing something impactful with his life.*

*He also served as a field support for me in my work with teens.  I have on a few occasions called on him to help me convince one of the youths that I work with to avoid the pitfalls of the street.  I have found this assistance invaluable because my youth respect his voice and opinion.*

These letters capture well Demetrius's multiple, diverse, and positive

attributes, and not surprisingly, align with how Demetrius sees himself.[20]

Demetrius, describing his best accomplishments:

---

[20]     *See* Allocution Statement of Demetrius Williams, Exhibit 1, ¶¶ 1-3.

> *Being mature, responsible and reliable enough for my mother to offer me employment with her business. When [she] first started her restaurant and catering business she did not have enough money to hire help. I worked with her every day doing whatever she asked of me receiving no pay. Watching her make a dream of hers a reality and knowing I played a part in that makes me very proud.*

Identifying his best attributes:

> *My best attributes are that I'm loyal, dependable, honest, and a trustworthy person.*

And, what he is most proud of:

> *Stepping up to the role of being a father is what I am most proud of. I was not ready to become a father and did not plan on it . . . When I first got the news I was scared and unprepared but as time went on I adjusted to this new role and being a father to my daughter means everything to me.*

## B.    NATURE & CIRCUMSTANCES OF THE OFFENSE

The nature and circumstances of Demetrius's offense cannot be characterized separately and apart from his personal history and characteristics. Nor can any fair understanding be reached without acknowledging and accepting the truth of his plight – born a black boy in the City of Boston, growing up inarguably on the wrong side of the racial divide[21] – extremely poor, often

---

[21]    *See* Washington Post, *The Perils of Being a Black Police Officer*, July 21, 2009, attached as Exhibit 6, describing the numerous racial "setbacks" occurring over many decades. For instance, in 1974 a desegregation plan unleashed havoc as hundreds of whites morphed into angry mobs. In 1988, inmate Willie Horton became a symbolic talisman in the presidential campaign of Gov. Michael Dukakis: Horton, a convicted murderer, had been released under a weekend furlough program backed by Dukakis and eventually committed armed robbery and rape. Some saw the GOP ads featuring Horton as racial flame-throwing: Horton was black.

Two years later, in 1989, Charles Stuart said his pregnant wife had been shot by a "black man" who rushed up to his car. Boston police began stopping young black men, hungry for an arrest. There was no black man; Stuart later jumped from a bridge and died. His brother had implicated him in the murder.

And in January, 1995. A young black man had been gunned down in an eatery. A

hungry, shuffling with his four brothers and single mother between apartments,

neighborhoods, and schools, while the ties that bind were always to Columbia

Point – that place termed a "national disgrace" and described as "one of the

worst public housing projects in the Nation"[22] – by virtue of his birth.

How else to possibly understand as well his initial introduction to the

criminal justice system at age 10, and repeated interaction with it thereafter

regardless of the paucity of evidence.  The following series of arrests, charges

and dismissals all arguably were due to race or guilt by association:

- July 31, 1996, (PSR ¶ 146), age 10: charge of Armed Assault with Intent to Rob dismissed;
- September 3, 1998, (PSR ¶ 147), age 12: charged with Larceny under

---

neighborhood resident dialed 911 claiming an officer had been shot.  He later said it was the quickest way to get help in an inner city establishment.  Four balck suspects were being pursued across a 10-mile area.  On a dead-end street, police believed they had cornered one of the suspects.  They pummeled him before he uttered a word, using a baton, fists, and boot-laden feet. The "suspect" spurted blood, dropped to the cold ground, tried to get up, only to be beaten more. His gurgling words were unintelligible through blood and pain.

The "suspect" was actually Michael Cox, a decorated undercover police offer who had himself been in pursuit of the suspects, had even been in the lead chase vehicle.  And who happened to be black.  At least two and possibly three officers participated in Cox's beating. More than two dozen officers would eventually arrive at the scene, some who held supervisory positions.  But in the follow-up investigation, no officer took responsibility for the beating.  Cox survived.  "The Boston police department chewed up one of its own and spit him out," says Dick Lehr, author of the [] "The Fence:  A Police Cover-Up Along Boston's Racial Divide."

Mired in the racial conflicts of a divided city, Lehr detailed one of the most controversial cases in the annals of the Boston Police Department, involving a brutal assault on a black plainclothes officer by his fellow cops and the resulting 1998 civil rights trial against the police force. Lehr painted the racial and political turbulence of Boston at the time, and explored the cultural backgrounds of the black officer, Michael Cox; his attacker and fellow officer, Kenny Conley; and Robert Smut Brown, a drug dealer involved in the killing that started it all. Cox, who responded to the murder and chased after the car carrying the suspects, was beaten very severely by his overzealous colleagues, waited for an administrative apology and got only a cover-up by the department. What followed was a sensational trial with all of the key ingredients of police brutality and a solid blue code of silence, with no winners.

[22]      *See* Point of Change, Exhibit 3 at 1:52 and 2:55.

$250 and Trespassing, both dismissed;

- December 18, 2001, (PSR ¶ 148), age 15:  charged with two counts of Armed Assault with Intent to Kill and two counts of Assault and Battery with a Dangerous Weapon, all dismissed;
- February 12, 2004, (PSR ¶ 149), age 17: charge of Trespassing dismissed;
- May 8, 2007, (PSR ¶ 150), age 21: charge of Trespassing dismissed;
- November 11, 2007, (PSR ¶ 151), age 21: charge of Carrying a Concealed Weapon dismissed;
- January 1, 2009, (PSR ¶ 152), age 22:  charges of Larceny from a Person and Assault and Battery dismissed;
- January 20, 2011, (PSR ¶ 153), age 24: charge of Possession of Class D with Intent to Distribute dismissed;
- March 27, 2013, (PSR ¶ 155), age 26: charge of Operating a Motor Vehicle with License Suspended dismissed;
- May 17, 2013, (PSR ¶ 156), age 27: charge of Affray dismissed upon completion of 20 hours community service;
- September 2, 2014, (PSR ¶ 157), age 28: charge of Operating a Motor Vehicle with License Suspended, dismissed.

Similarly, the following cases disposed of via Continuances Without a Finding

and then dismissed, also arguably resulted from racial profiling or guilt by

association:

- July 21, 2003, (PSR ¶ 132), age 17: charge of Use of a Motor Vehicle without Authority concerned a motor scooter Demetrius was permitted to ride by a friend in Columbia Point who assumed owned the scooter.  The scooter was confiscated at some point by security staff and contrary to the synopsis provided in the PSR, Demetrius never provided any paperwork to security, nor did he make any claims regarding a relationship with the person who owned the scooter.  The case was continued without a finding for six months and then dismissed;
- September 18, 2003, (PSR ¶ 133), age 17: charged with the racial trifecta of Trespassing, Resisting Arrest, and Disorderly Conduct, in connection with visiting his *grandmother* at Columbia Point, Demetrius was arrested allegedly pursuant to a No Trespass notice.  Officers then alleged Demetrius kicked them while "attempt[ing] to get the defendant to stand up to await transport for booking," resulting in an additional charge of Assault and Battery with a Dangerous Weapon.  All charges were continued without a finding and dismissed a year

later.

Highlighting the facts regarding these interactions between Demetrius and law enforcement, is not to suggest that Demetrius never did anything wrong.  Rather, it is to underscore the complex relationship that develops as a fact of life between black youth and the criminal justice system over time.  Of course, laws must be enforced.  But in the United States of America, slogans such as BlackLivesMatter have developed as a call to action; a call to cry out in defense of black people, when they are uniquely, systematically, and savagely targeted by the state.  It is a rallying cry still necessary 152 years after the Emancipation Proclamation was signed.[23]  Why?  Because the reality is that regardless of hashtags, protests, and political movements, some black lives do *not* seem to matter.  Particularly those of young black men with prior criminal records – i.e., the Demetrius Williams's of this world.

To be clear, Demetrius did repeatedly and willfully break the law by dealing drugs.  In retrospect however, Demetrius's relationship with law enforcement and the broader criminal justice system might have remained at the level of the aforementioned sorts of intrusions that young black men have to deal with every day, were it not for the loss of his older brother Jamal, who had been

---

[23]     When we say Black Lives Matter, we are broadening the conversation around state violence to include all of the ways in which Black people are intentionally left powerless at the hands of the state.  We are talking about the ways in which Black lives are deprived of our basic human rights and dignity.  How Black poverty and genocide is state violence.  How 2.8 million Black people are locked in cages in this country is state violence. . . .#BlackLivesMatter is working for a world where Black lives are no longer systematically and intentionally targeted for demise. *See* http://blacklivesmatter.com/about

a caretaking, guiding, and tempering force in Demetrius's life during his first 18 years of life.  Reviewing Demetrius's criminal record supports this characterization as it is around this time, March, 2005, that Demetrius picks up the first charges of any significance, (PSR ¶ 134); which later result in convictions and his first sentence of incarceration.

That being said, the Court has before it the government's statement as to the details of the nature and circumstances of Demetrius's offense conduct in this case.  His primary point of contention is with Probation's characterization as to his role in and his relationship with other individuals named in the conspiracy, which it utilizes to increase his base offense level by +4 under U.S.S.G. § 3B1.1(a).  For instance, David Jones was a childhood friend of Demetrius and the quantity of calls between the two men are not indicative of illicit conduct, but rather reflect their lifelong friendship (*see* PSR, ¶ 16).  Demetrius was also not a "leader in the Columbia Point Street Gang;" nor is there any truth to the unfounded allegation that "as the size of the Columbia Point Street Gang grew in 2010, the leadership became split between two crews. . . ."  (PSR, ¶¶ 59-60)

Rather, in the context of this case, Demetrius's historical role within his family translates at most into a managing or supervisory role – which the Government correctly deemed as worthy only of a +2 increase in his base offense level pursuant to U.S.S.G. § 3B1.1(c)).  Further, while accepting responsibility without reservation or excuse for his misconduct and not wishing or intending to point any fingers at anyone else, Demetrius would simply direct the Court's

21

attention to the government's own statement of the offense which reflects others

acting in organizing or leadership roles, (*see* PSR, ¶¶ 31, 67, and 76).   As for any

"split" in Demetrius's relationship with the Berry brothers, it had nothing to do

with "the size of the Columbia Point Street Gang" or decisions about

"leadership," rather Demetrius had a personal falling out with the Berrys and no

longer wished to personally associate with them.

### C.      NEED FOR THE SENTENCE IMPOSED

> 1.   *To reflect the seriousness of the offense, to promote respect for the law,*
> *and to provide just punishment for the offense.*[24]

The purposes set forth in section 3553(a)(2)(A) are generally referred to,

collectively, as "retribution."   Retribution involves calculating moral culpability,

considering only the defendant's past actions, not his probable future conduct or

the effect that the punishment might have on crime rates or otherwise.

Retribution also examines the actor's degree of *blameworthiness* for his past

actions, focusing on the offense being sentence.   The degree of blameworthiness

of an offense is generally assessed according to *two kinds of elements:*  the *nature*

*and seriousness of the harm caused or threatened* by the crime; and the *offender's*

*degree of culpability in committing the crime, in particular, his degree of intent (mens*

*rea), motives, role in the offense, and mental illness or other diminished capacity.*[25] The

---

[24]      *See* 18 U.S.C. § 3553(a)(2)(A).

[25]      Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment:*
*"Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied),
Exhibit 7.

seriousness of the harm caused by *any* participation in the distribution of drugs into society cannot be denied.  However, a ten-year sentence is an objectively long sentence, which more than adequately reflects the seriousness of the offense of conviction.

### 2.   *To afford adequate deterrence to criminal conduct;*[26]

Deterrence has both a specific and a general function.  Specific deterrence dissuades the particular defendant from engaging in criminal conduct (and is really part of the need to "protect the public from further crimes of the defendant.")[27]  In contrast, general deterrence discourages others from engaging in similar conduct.  The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one.  But the question for the Court is "marginal deterrence," i.e., whether any particular quantum of punishment results in increased deterrence and thus decreased crime.  Here the findings are uniformly negative:  *there is no evidence that increases in sentence length reduce crime through deterrence.*

Current empirical research on general deterrence shows that while *certainty* of punishment has a deterrent effect,

> increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, [], reached that conclusion, as has every major survey of the evidence."[28]

---

[26]   *See* 18 U.S.C. § 3553(a)(2)(B).

[27]   Discussed at Section III (C)(3), *infra*.

[28]   Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice:  A Review of

In another recent study of drug offenders sentenced in the District of Columbia, researchers tracked over a thousand offenders whose sentences varied substantially in terms of prison and probation time.  The results showed that variations in prison and probation time "have no detectable effect on rates of re-arrest."[29]  "Those assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame."[30]  In other words, "at least among those facing drug-related charges, incarceration and supervision seem not to deter subsequent criminal behavior."[31]

Besides the ineffectiveness of punishing one person to deter others, another problem with justifying punishment as a means to deter others is that it is immoral to punish one person merely to promote deterrence of others.

> Juridicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime.  For one man ought never be dealt with merely as a mean subservient to the purpose of another.[32]

---

Research 28-29 (2006), Exhibit 8.

[29]      Green, Donald P., and Winik, Daniel, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders* (October 28, 2009). Criminology, May 2010, Exhibit 9 at 358.

[30]      *See* Exhibit 9 at 382.

[31]      *See* Exhibit 9 at 358.

[32]      Immanuel Kant, The Science of Right 195 (W. Hastie trans., 1790).

Calculating the punishment necessary to dissuade others from engaging in similar conduct is undoubtedly difficult.  Balancing the ineffectiveness and ethical problems with general deterrence, against the financial costs to society of imprisoning Demetrius yearly ($30,621.00),[33] arguably leads to the conclusion that general deterrence is not a good reason to add an extra 31 – 68 months to the mandatory minimum prison term of 120 months in this case.  Additionally, counsel would argue that the savings that would be generated by incarcerating Demetrius for 120 months rather than 151 months ($79,112), or 188 months ($173,536), would be much better spent on measures that would provide specific deterrence for Demetrius.

First and foremost is still the need for Demetrius to undergo a neuropsychological evaluation in order to (a) identify and treat the psychological and emotional impairments caused by the numerous traumatic events he has endured in his life, and (b) evaluate the cognitive impairments he is operating under, which required special education services beginning in the fourth grade, appear to have led to him dropping out of school in the eleventh grade without a high school diploma, and presumably would hamper any attempt to obtain his GED upon release.  These issues all require professional assistance and cannot be accomplished by Demetrius on his own.

---

[33]  *See* PSR, ¶ 210, *citing* figures provided by the Administrative Office of the United States Courts, dated June 16, 2015.

       3.   *Protect the public from further crimes;*

Of all of the purposes of sentencing, the need to protect the public from further crimes of the defendant is presumably the one of greatest practical concern, and also the most capable of being measured.  For example, as the United States Sentencing Commission recognized, given the data indicating that abstinence from illicit drug use and high school completion reduces recidivism rates, rehabilitation programs targeted to reduce drug use and support earning a high school diploma have high cost-benefit values.[34]

Demetrius's verifiable drug and alcohol use disorder, and documentation of such in the PSR, will render him eligible to seek admission to the Residential Drug Abuse Program ("RDAP") run by the Bureau of Prisons.  Demetrius intends and is committed to participating in the program immediately upon classification to a BOP facility.  The unit-based component of RDAP, consisting of a 500-hour, 9-month residential program, the follow-up services provided during the first part of the after-care requirement, and the transitional drug and alcohol abuse treatment phase of the program that occurs in a halfway house or on home confinement, is research-based and rigorous.  If he is able to complete the program, Demetrius will undoubtedly have voluntarily availed himself of therapy, obtained the education, and developed the mental and emotional tools to allow him to live drug and alcohol-free when he is released.

---

[34]     United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, May, 2004, Exhibit 10.

Demetrius has still not attained a GED however.  Therefore, in addition to this Court's recommendation that he be admitted to the RDAP program while in BOP custody, a high cost-benefit value could most clearly be derived by this Court providing for professional assessment of what Demetrius's cognitive impairments are and providing him with the services needed to be successful in pursuing a GED.  At a certain point, time spent in BOP custody is going to essentially be dead time and serve no purpose of sentencing – as Demetrius cannot obtain such specialized assessment and services for his cognitive impairments while incarcerated.

Finally, and most importantly, in considering the conditions that would contribute most to the goal of specific deterrence, it would be worthwhile for the Court to consider a 2016 Report from the Community Corrections Collaborative Network, ("CCCN"), a network comprised of the leading associations representing 90,000-plus probation, parole, pretrial, and treatment professionals around the country.  The Report makes clear that the use of jail and prison is the *not* the best way to prevent crime.  That myth, is the first CCCN's Report sets out to debunk:

> While a sentence of jail or prison removes individuals from the community and, in this regard, prevents crime against the general public through incapacitation, research is clear that incapacitating people is unlikely to deter them from committing crimes in the future.  In fact, research suggests that, for many, the experience of being in jail or prison will actually increase the likelihood that they will reoffend

following their confinement.[35]

In fact, as the findings relayed by the CCCN reveal:

    a.  Those confined to prison recidivate at a much higher rate than those sentenced to community corrections;

    b.  Incarceration can actually *increase* recidivism;

    c.  The vast majority of people in jails *do not receive the treatment and services they need to live a crime-free lifestyle;*

    d.  Harsh penalties do not improve long-term outcomes; and

    e.  Research on longer prison sentences is mixed; studies show increased recidivism under most circumstances.[36]

        4.  *Provide needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;*

This Court has previously been unwilling to commit resources to have Demetrius evaluated and tested by an expert in the field of neuropsychology, and therefore it is operating in the dark as to the specific cognitive and psychological supports Demetrius needs in order to be rehabilitated. While that may mean he loses out on availing himself of correctional treatment that could be useful while in custody, regardless, Demetrius will be subject to a five-year term of supervised release at which time it may begin to become clear what services are needed in order for him to make effective use of any educational and vocational training offered. As stated previously, counsel submits that a

---

[35]    *See* Myths & Facts, Why Incarceration is Not the Best Way to Keep Communities Safe. National Institute of Corrections/Community Corrections Collaborative Network, 2016, Exhibit 11, p. 4.

[36]    *See* Exhibit 11, pp. 4-5.

sentence of 120 months to a Bureau of Prisons facility would serve the

retributive, incapacitating, and deterrence goals of sentencing.  Rehabilitiation

would also be served in part at the same time during this period by Demetrius's

ability to participate in the RDAP program.  However, no additional time in a

Bureau of Prisons facility can begin to address Demetrius's other needs with

respect to educational and mental health care, central to achieving the goal of

rehabilitation.  Consequently, counsel would urge this Court to consider home

confinement for any term of months it deems necessary to impose beyond the

mandatory minimum term.

If the Court, or the government, is concerned with the punitive nature of

confinement, i.e., perhaps subscribing to the myth that community supervision is

soft on crime, the 2016 CCCN Report also debunks that one as well:  "Individuals

under community supervision reported that "doing time" is easier than having

to abide by their release requirements." [37]  As numerous studies cited by the

CCCN Report found:

   a.  Treatment-oriented sanctions are perceived to be punitive by justice-
       involved individuals;

   b.  A survey of probationers and parolees found that they viewed
       nonincarcerative, treatment-oriented responses – such as completing
       writing assignments, participating in treatment, or providing
       community service – substantially more punitive than jail; and

   c.  Repeat prison-goers view prison as less punitive than those with less
       prison experience.[38]

---

[37]     *See* Exhibit 11, p. 7

[38]     *See* Exhibit 11, p. 7.

If the concern is that community corrections does not work, the CCCN

Report cites substantial evidence otherwise:

    a.  Community supervision programs can reduce the risk of recidivism by 10 to 30% when attention is paid to criminogenic needs, in particular, ***studies consistently demonstrate the effectiveness of cognitive-behavioral treatments.  These strategies assist offenders with changing harmful thinking patterns and attitudes, as well as developing prosocial skills.  Further, recidivism reduction effects have been determined to be greater when services and interventions are delivered in the community rather than in residential/institutional settings;***

    b.  Treatment services can reduce recidivism up to 30% when services are matched to the individual's unique traits, especially when medium and high risk individuals receive appropriate behavior changing programming; and

    c.  The use of core correctional practices – for example, effective modeling and reinforcing prosocial attitudes, teaching concrete problem solving skills, and building a professional relationship that allows for open communication and respect – delivered in the community contributes to recidivism reduction.[39]

If the concern is that effective programming for Demetrius would be

expensive, the fact is, according to the CCCN Report, not only do community

corrections programs achieve better results, "[t]he more communities invest in

effective treatment, social services, and community supervision, the greater their

financial return on investment."  In addition to citing figures concerning the

extraordinary differences in costs between incarceration in a federal facility and

community confinement such as discussed in the preceding section, the CCCN

---

[39]    *See* Exhibit 11, p. 6.

Report also includes the following eye-opening statistics:

a.  Research by the Washington State Institute for Public Policy conducted in 2016, evaluating twenty-five community-based programs to determine return on investment, found that the ***net value*** (cost of an intervention less the savings derived from preventing future crime) of the average targeted, evidence- and community-based adult correctional program is $11,150 per adult offender.

b.  A cost-benefit review of evidence-based and research-based programs for adult community corrections showed, among other findings, ***that cognitive-behavioral treatment has a total per participant benefit of $10,050***, as well as ***a 100% likelihood that benefits will exceed costs.***[40]

The Court has at its disposal every sentencing option in framing a just sentence for Demetrius.  120 months in a Bureau of Prisons facility and home confinement with treatment-oriented sanctions for any additional term of confinement it deems necessary makes sense on every level.

## IV.    REQUEST FOR RECOMMENDATIONS

Demetrius respectfully requests this Court make the following recommendations to the Bureau of Prisons:

(a)  That he be admitted to the RDAP program; and

(b)  That he be designated to a BOP facility with the RDAP program – specifically, FCI – Fort Dix, if eligible for a low security institution; or FCI – Fairton, if designated to a medium security institution.

---

[40]    *See* Exhibit 11, p. 9.

Dated:  August 31, 2017                    Respectfully submitted,
                                           By His Attorney:


                                           /s/ John G. Swomley
                                           John G. Swomley, BBO# 551450
                                           Swomley & Tennen, LLP
                                           50 Congress Street, Suite 600
                                           Tel. 617-227-9443
                                           jswomley@swomleyandtennen.com


### Certificate of Service

I hereby certify that a true copy of the above document was served upon all parties by ECF filing this 31st day of August, 2017, and served upon United States Probation by email to:  Jennifer_Broquist@map.uscourts.gov.


                                           /s/ John G. Swomley
                                           John G. Swomley